OPINION OF THE COURT
Randall T. Eng, J.
In this age of participatory journalism, wherein the greater television audience’s apparent appetite for instant and oftentimes gory satisfaction is increasingly being satiated by means of the hand-held video camera and satellite link, a television program entitled "The System” is being produced and distributed by the movant herein, Courtroom Television Network (Court TV). As described by Steve Johnson, executive producer for Court TV, The System is a "weekly one-hour legal news program produced by Court TV and distributed on cable TV systems throughout the United States.” Based upon the theme of "American Violence — American Justice,” The System purports to follow for a period of several months the criminal cases that arise from police activity in the Far Rockaway section of Queens County (the 101st police precinct), "tracking each case through the legal system, from crime report through verdict and (possible) sentencing.”
On April 13, 1994, the defendant — Joseph Soto — was arrested by Police Officer Thomas Ross of the 101st precinct on charges of criminal possession of stolen property in the fourth degree and unauthorized use of a vehicle in the third degree. These charges, which arose from the defendant’s alleged possession of a stolen 1988 BMW motorcycle, have resulted in an indictment charging the defendant with one count of criminal possession of stolen property in the third degree, one count of criminal possession of stolen property in the fourth degree, *110 and the two misdemeanor offenses of unauthorized use of a vehicle in the third degree and criminal mischief in the fourth degree.
On the evening of the defendant’s arrest, Police Officer Ross was interviewed in the muster room of the 101st precinct station house by associate producer/reporter Mike Ayala of Court TV. The Ayala interview of Officer Ross was conducted on videotape and was, to a certain degree, overheard by Mr. Soto from his position in an adjacent holding cell in the same room. The interview in question was of some 20 minutes duration, and its subject was Officer Ross’s April 13, 1994 arrest of Joseph Soto and the paperwork and administrative procedures that followed the arrest.
Upon learning of the existence of the videotaped interview of Officer Ross, counsel for the defendant caused a subpoena duces tecum to be personally served upon Mike Ayala, on August 1, 1994, at the offices of Court TV. The language of the subpoena directed that Mr. Ayala appear before this court on August 9, 1994, and to bring with him the following material: "Videotapes, notes, memoranda and/or other writings pertaining to Courtroom Television Network interview with Police Officer Thomas Ross, Shield #18332, including any and all statements, utterances, descriptions and accounts of the arrest of Joseph Soto on or about 4/13/94.”
Acting upon the belief that the materials requested by the defendant were qualifiedly privileged from compelled disclosure pursuant to the terms of New York’s Shield Law, Civil Rights Law § 79-h (c), and by the First Amendment of the United States Constitution and article I, § 8 of the New York Constitution, Court TV and Mike Ayala moved for an order quashing the subpoena duces tecum. Prior to the August 9, 1994 return date of the instant motion, an approximately 30-second segment of the Ayala-Ross videotaped interview was broadcast by Court TV on Sunday night, August 7, 1994, during a weekly installment of The System, a portion of which focused upon the legal difficulties surrounding Joseph Soto. On August 9, 1994, the parties appeared before this court and offered oral argument in support of their respective legal positions, as outlined in their written memorandums of law.
CONCLUSIONS OF LAW
I. The Shield Law
Nearly 25 years ago, the New York State Legislature *111 adapted the so-called Shield Law (L 1970, ch 615) for the protection of journalists and newscasters, recognizing that " '[freedom of the press is one of the foundations upon which our form of government is based’ ” (Matter of Beach v Shanley, 62 NY2d 241, 249; Civil Rights Law § 79-h). Thereafter, in granting a television reporter’s motion to quash a Grand Jury subpoena, the Court of Appeals in Matter of Beach (supra) held that the statutory protection afforded reporters against compulsory disclosure of their sources or information is not effected by the fact that "the information concerns criminal activity and, indeed, even when revealing the information to the reporter might itself be a criminal act” (Matter of Beach v Shanley, supra, at 245). That protection against disclosure was "unqualified” and related to a reporter’s "confidential sources and materials” (O’Neill v Oakgrove Constr., 71 NY2d 521, 524, n 1).
In the case at bar, the journalistic product sought to be protected derived from a clearly nonconfidential source, i.e., Police Officer Thomas Ross. As such, any protection afforded is only "qualified,” as was first recognized by the Court of Appeals in O’Neill v Oakgrove Constr. (supra, at 527-529). In affording limited protection from disclosure of nonconfidential news material, the Court of Appeals in O’Neill held that the qualified privilege, when applicable, exists simultaneously under the First Amendment’s guarantee of free press and speech and pursuant to article I, § 8 of the New York Constitution. In order to overcome the qualified privilege and obtain disclosure, a litigant is required to satisfy a tripartite balancing test that was adopted therein by the Court of Appeals. This tripartite test was eventually codified into law by the New York State Legislature when it amended Civil Rights Law § 79-h (c) (L 1990, ch 33, § 2, eff Nov. 1, 1990). Section 79-h (c), in pertinent part, now provides: "Qualified protection for nonconfidential news * * * no professional journalist or newscaster * * * presently * * * employed * * * with any newspaper, magazine, news agency * * * television transmission station or network * * * shall be adjudged in contempt by any court in connection with any civil or criminal proceeding * * * for refusing or failing to disclose any unpublished news obtained or prepared by a journalist or newscaster in the course of gathering or obtaining news * * * unless the party seeking such news has made a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party’s claim, defense or *112 proof of an issue material thereto; and (iii) is not obtainable from any alternative source” (emphasis supplied).
Since there is no dispute concerning the status of Mike Ayala as a "professional journalist * * * presently * * * employed [by a] television * * * network,” or the fact that the information and materials sought by the defense qualify as "unpublished news,”[1] it is left for the court to determine whether the defendant has made a clear and specific showing with respect to the statutory tripartite balancing test described hereinabove.

Highly Material And Relevant

By prior decision of this court, a Huntley-Mapp suppression hearing was ordered for the purpose of resolving the issues surrounding the voluntariness of a certain oral statement made to the police following the defendant’s arrest and for a judicial determination with respect to the legality of the police "stop” of the stolen motorcycle which the defendant was operating prior to his arrest. In arriving at the ultimate decision attendant to the Huntley-Mapp suppression hearing, the court must, in the first instance, carefully consider and weigh the credible facts surrounding the stop and eventual arrest of the defendant. For if the arrest of the defendant was illegal, "[t]he burden rest[s] upon the People to demonstrate that the statements were not acquired by exploitation of the arrest but by means sufficiently distinguishable from it to be purged of illegality” (People v Johnson, 66 NY2d 398, 407; see generally, People v Martinez, 37 NY2d 662). If the People are not able to satisfy that burden of proof, then the defendant’s statement must be suppressed as the fruit of the illegal arrest (see, Wong Sun v United States, 371 US 471; People v Diaz, 131 AD2d 690, lv denied 70 NY2d 710). While an individual operating a stolen motorcycle would lack "standing to challenge [any] search of the vehicle” itself, such an individual would "still [be] entitled to challenge unlawful interference with his person” as a result of the police stop, and would therefore have standing to move to suppress any "fruits of an illegal arrest” (People v Gittens, 110 AD2d 908, citing LaFave and Israel, Criminal Procedure § 9.1).
Here, the movant has conceded that a part of the subject interview focused upon the events leading up to the stop and *113 eventual apprehension of the defendant. Therefore, by its very nature, at least certain parts of the interview are per se highly material and relevant to one of the primary issues present at the pending suppression hearing. Contrary to the movant’s argument, the defendant is not merely engaged in "speculative probing” for something "that might prove helpful to the defense.” The statute imposes no additional duty upon the defendant of demonstrating helpfulness to the defense under this first prong of the test, merely that the information requested is highly material and relevant. The court finds that the defendant has made the requisite clear and specific showing to satisfy the first prong of the test.

Not Obtainable From Any Alternate Source

In attempting to demonstrate that the defendant has failed to satisfy the third prong of the test, namely, that the information contained in the interview is not obtainable from any alternative source, the movant contends that at least two alternative sources do, in fact, exist: Police Officer Ross, during anticipated "cross-examination” at the suppression hearing, and the defendant himself.
Movant’s argument with respect to Officer Ross is simplistic and, more importantly, fails to recognize the inherent superiority of the magnetic recording videotape that has, in effect, become an indispensable party to these proceedings. For not only is the videotape the best source of the information imparted by Officer Ross, if unaltered it is the only true source available. To simply rely upon a possibly uncooperative, if not "hostile” witness — whose very credibility will be under attack by defense counsel — to remember in exact detail, without modification or omission resulting from faded memory of bias, the very words spoken to Mr. Ayala would at best be, in this court’s opinion, an uncertain proposition.
Nor can it be said that the defendant himself qualifies as an alternative source. Having heard but a portion of the interview from his custodial location within a holding cell, and not then equipped with any recording device or other means of memorializing the entire contents of the interview, the defendant is found not to be the font of information the movant suggests. Therefore, the court concludes that the defendant has made the requisite clear and specific showing to satisfy the third prong of the test.

Critical Or Necessary

The defendant has raised three issues in support of his *114 burden of proof with respect to the second prong of the Shield Law statute. In sum and substance, the defendant contends that the issues raised herein demonstrate by a "clear and specific showing” that the information sought would be "critical or necessary” to the proof of a material issue, i.e. — probable cause — at the suppression hearing.
Initially, the defendant maintains that the account of his encounter with the defendant given by Officer Ross on videotape "may” be his (Officer Ross’s) most reliable version and that the passage of time and other cases involving different defendants may have acted to cloud or distort the officer’s recollection of the events in question. While the concerns of the defendant may represent a predictable scenario involving any witness who is called to testify in court several months or longer after the happening of a particular event, the defendant has been completely unable to make the required clear and specific showing with regard to this particular case. Mere speculation without demonstrative factual corroboration is legally insufficient to impinge upon the First Amendment safeguards embodied within Civil Rights Law § 79-h.
Next, the defendant argues that the videotaped statement "may” prove inconsistent with testimony to be offered by Officer Ross at the suppression hearing and/or trial. Again, the defendant’s thesis is couched in the unspecific and cloudy terminology of the indefinite. In amending Civil Rights Law § 79-h and creating the "qualified privilege,” the Legislature adopted the above-described tripartite balancing test as a stringent condition precedent to any successful attempt to compel disclosure of unpublished nonconfidential news obtained by a reporter. Were this court to countenance vague and nonspecific claims of criticality and necessity, it would thereby provide the impetus for all defense attorneys to demand disclosure on every criminal case in which there has been an interview of a police officer by a reporter. This court does not believe that Civil Rights Law § 79-h can nor should be interpreted to yield such a result.
Finally, the defendant has sought to justify disclosure by making reference to certain recent findings announced by the so-called Mollen Commission, concerning potential falsification of sworn testimony by members of the New York City Police Department. The work of that distinguished body notwithstanding, this court rejects the notion that Civil Rights Law § 79-h should be wholly eviscerated for the purpose of provid *115 ing a prophylactic effect upon the testimony of Officer Ross at the suppression hearing.
Therefore, the court concludes that the defendant has failed to make the required clear and specific showing with respect to the "critical or necessary” second prong of Civil Rights Law § 79-h.
II. Sixth Amendment Claim
As a separate ground for obtaining disclosure of the videotape and/or any notes relating to the Ayala-Ross interview, the defendant claims that his right of access to the subject material is protected by the Sixth Amendment to the United States Constitution. In support of this proposition, the defendant asserts that any judicial determination effecting disclosure of otherwise qualifiedly privileged "news” should be guided by the principles set forth by the Court of Appeals in People v Gissendanner (48 NY2d 543).
The holding in Gissendanner (supra) evolved from an appeal of a trial court’s refusal to honor defendant’s request that it issue subpoenas duces tecum requiring the production of personnel records of two police officers, the principal witnesses against the defendant at trial. In striking a balance between "the constitutional roots of the guarantees of compulsory process and confrontation” and "the State’s interest in safeguarding the confidentiality of police personnel records,” the Court of Appeals declared that "though access must be afforded to otherwise confidential data relevant and material to the determination of guilt or innocence * * * there is no such compulsion when requests to examine records are motivated by nothing more than impeachment of witnesses’ general credibility” (People v Gissendanner, supra, at 548). The Court went on to state that "entitlement to access on no more than a bare allegation that the inspection is sought as fodder for an untracked attack on credibility would render the principle of confidentiality meaningless for all practical purposes” (People v Gissendanner, supra, at 549-550). Consequently, in order to obtain disclosure under the standards set forth in Gissendanner,[2] a party would, of necessity, be required to put forth in good faith "some factual predicate which would make it reasonably likely that the file will bear such fruit and that the *116 quest for its contents is not merely a desperate grasping at a straw” (People v Gissendanner, supra, at 550).
In Gissendanner (supra) there was no such demonstration of a factual predicate, nor has there been here. Defendant’s conclusion that it is more than reasonably likely that the "out-takes”[3] carry the potential to contain exculpatory or impeachable material is devoid of any objective underpinning and is reducible to nothing more than a self-motivated, but understandable, grasp for favorable evidence.
Moreover, this court does not share the defendant’s opinion that the decision in this matter should be explicitly governed by the principles of law established under Gissendanner (supra), a case involving disparate issues, and one that was decided prior to the enactment of the Shield Law by the Legislature. The court is satisfied that the tripartite balancing test codified under Civil Rights Law § 79-h (c) serves the purpose of protecting the defendant’s rights to confrontation and due process, while at the same time serving as a buffer against unwarranted intrusion into the protected sphere of First Amendment freedom of the press.
Accordingly, the motion brought by Courtroom Television Network and Mike Ayala for an order quashing the subpoena duces tecum issued in connection with People v Soto (index No. 1709/94) is granted.
In rendering its decision, the court has weighed very carefully the constitutional, statutory and decisional rights of the parties in this specific factual context. This court, however, remains concerned with the scenario in which the journalist is so involved in the story, as to become an active participant in it.
The qualified protection for nonconfidential news conferred by statute will be evaluated with care by this court in any sequence of events in which an intimate relationship between a journalist and a law enforcement officer serves to undermine the professional objectivity that is contemplated under the First Amendment. Such scrutiny is essential to insure that a criminal defendant is not deprived of significant evidence, where no bona fide constitutionally protected right exists.

. Clearly, the "30 second” segment broadcast by Court TV on August 7, 1994 no longer qualifies as unpublished news and is no longer afforded statutory or constitutional protection.

. Requests for police personnel records are now governed by Civil Rights Law § 50-a, which on its face requires a "clear showing of facts” before a Judge can even order the records for an in camera review to determine relevance and materiality.

. Referring to the balance of the interview not broadcast on August 7, 1994.