OPINION OF THE COURT
Joseph G. Golia, J.
On April 3, 1994, two teenage boys and a young girl were shot at a housing project located in the Far Rockaway section of Queens County, an area within the confines of the 101st Police Precinct. Six days later, on April 9, 1994, Mr. Jonathan Hurley was contacted at his home by Police Detectives Sheldon Howard and Edward Henson. As a result of this encounter, Mr. Hurley went with the detectives to the 101st Precinct for questioning. There, Mr. Hurley made a statement which implicated himself in the shootings.
Immediately after the interrogation, Mr. Hurley led the detectives to the place where he had disposed of the gun used in the shootings.
In the course of the criminal proceeding, Mr. Hurley was granted a combined Huntley-Mapp hearing. At issue is whether the police had afforded him all of his constitutional rights in the course of obtaining the statement and the subsequent recovery of the physical items.
Some of these events were the subject of a television report entitled The System[1] which was produced by Courtroom Television Network (Court TV) and its correspondent, Timothy Sullivan. In preparation for the hearing, the defendant obtained a court-ordered subpoena and served it upon Mr. Sullivan. The subpoena required that Mr. Sullivan appear at the suppression hearing for the purpose of testifying as to his personal knowledge of the events and bring with him his notes, records, and videotape out-takes taken on April 9, 1994, concerning the defendant.
Court TV, on behalf of Mr. Sullivan, moved to quash the subpoena on the grounds that the information sought is protected from disclosure by the First Amendment of the United States Constitution; New York Constitution, article I, § 8; and the New York Shield Law, Civil Rights Law § 79-h (c).
A hearing pursuant to the Shield Law was commenced on February 9, 1995, and continued on July 18, 1995 at which the *536 defendant presented three witnesses: Detectives Howard and Henson, and Mr. Sullivan. The movant, Court TV, did not present any witnesses. At the conclusion of the hearing, both parties were afforded the opportunity to submit memoranda of law which were received on August 9, 1995, August 14, 1995 and August 25, 1995.
FINDINGS OF FACT
The facts and circumstances that are relevant to the narrow issues addressed by this hearing are outlined below.
I find that there is no videotape in existence, unpublished or otherwise, of Mr. Hurley arriving at the 101st Precinct on April 9, 1995, whether in handcuffs, as he alleges, or not.
Furthermore, I find that Court TV journalist, Timothy Sullivan, was present in the interrogation room during some portions of the questioning that resulted in the statement which is at issue. In whatever regard that Detective Henson’s testimony is contrary to this fact, it is discounted.
Mr. Sullivan took notes during the course of the interrogation, but did not videotape any portion of those proceedings. Accordingly, that portion of the underlying subpoena which demands the production of videotape out-takes is denied inasmuch as there are no relevant out-takes to be produced.
Notwithstanding, however, the written notes and personal observations of Mr. Sullivan are clearly relevant to the issues at hand, and therefore require a careful examination of the applicable laws to determine their disposition.
CONCLUSIONS OF LAW
In 1970, New York first adopted the Shield Law in order to protect reporters from contempt charges for refusing or failing to reveal information or sources thereof obtained in the course of newsgathering.[2] In signing the legislation, Governor Rockefeller stated: "[Fjreedom of the press is one of the foundations upon which our form of government is based * * * [T]he threat to a newsman of being charged with contempt and of being imprisoned for failing to disclose his information or its sources can significantly reduce his ability to gather vital information.” (1970 NY Legis Ann, at 508.)
For the next few years, courts interpreted the statute as providing only a qualified privilege and found an implicit requirement of confidentiality of sources and materials. (See, *537 Matter of WBAI-FM, 68 Misc 2d 355 [1971], affd sub nom. Matter of WBAI-FM v Proskin, 42 AD2d 5 [1973]; Matter of People v Wolf, 69 Misc 2d 256 [1972], affd 39 AD2d 864 [1972].) Even though the statute was amended in both 1975 and 1981 to further protect journalists from requests for information or disclosure of sources,[3] some lower courts still upheld the confidentiality requirement. (See, People v Korkala, 121 Misc 2d 291 [1983], affd as mod 99 AD2d 161 [1984]; People v Le Grand, 67 AD2d 446 [1979].) However, the Court of Appeals decision in Matter of Beach v Shanley (62 NY2d 241 [1984]) overruled this interpretation. The Beach Court held that the amended Shield Law provided "a broad protection to journalists without any qualifying language.” (Supra, at 251.)
Despite the unqualified protection afforded to reporters in Matter of Beach (supra), the Court of Appeals in Matter of Knight-Ridder Broadcasting v Greenberg (70 NY2d 151 [1987]) reinstated the "cloak of confidentiality” requirement as a prerequisite for any application of the Shield Law. (Supra, at 156.) The decision thus left unprotected any journalistic product obtained from nonconfidential information or sources.
However, eight months later, in a subsequent decision, O’Neill v Oakgrove Constr. (71 NY2d 521 [1988]), our high Court held that limited protection from disclosure of nonconfidential news material should be afforded to reporters. The O’Neill Court reasoned that this qualified privilege existed simultaneously under the First Amendment of the United States Constitution and New York Constitution, article I, § 8. Accordingly, that Court adopted a tripartite balancing test to determine whether a litigant can overcome the qualified privilege. (Supra, at 524-527.)
In 1990, the three-part test adopted in O’Neill (supra) was codified by the addition of a new section to the Shield Law.[4] Civil Rights Law § 79-h (c) now requires that a litigant seeking testimony from a reporter about his nonconfidential newsgathering activities, or nonbroadcast resource materials, must *538 make a clear and specific showing that the information is: (1) highly material and relevant; and (2) critical or necessary to the litigant’s claim or defense; and (3) not obtainable from any alternative source.
In the case at bar, there is no dispute concerning the status of Timothy Sullivan as a professional journalist,[5] or the fact that the information and materials sought by the defense qualify as unpublished news.[6] Thus, Court TV and Mr. Sullivan are entitled to assert the newsgathering privilege as grounds for quashing the subpoena.
Moreover, it is clear that Mr. Sullivan had no understanding or expectation of confidentiality with either Mr. Hurley or the police detectives regarding the viewing of the interrogation. Consequently, there is no absolute privilege which protects the movant’s materials (see, Civil Rights Law § 79-h [b]), and therefore any protection that might be afforded to the journalistic material can only be of a qualified nature. (See, O’Neill v Oakgrove Constr., supra, at 527-529; Civil Rights Law § 79-h [c].) Nevertheless, the burden remains on the defendant to overcome this qualified privilege by satisfying the tripartite balancing test adopted by the Court of Appeals in O’Neill and codified by subdivision (c) of Civil Rights Law § 79-h.
Hence, the only issue for me to determine is whether the defendant has made a clear and specific showing that the material sought is: (1) highly material and relevant; (2) critical or necessary to the maintenance of defendant’s claim or defense; and (3) not obtainable from any alternative source.
While determining the primary issue in this case, I am confronted with two competing interests: the interest in maintaining the newsgathering privilege of the press and the evidentiary needs of a criminal defendant. In reconciling these two competing interests, each must be given their full scope.
*539 The newsgathering privilege reflects the vital and constitutionally protected functioning of an independent and vigorous press. Most importantly, "without some protection for seeking out the news, freedom of the press could be eviscerated.” (Branzburg v Hayes, 408 US 665, 681 [1972].) However, when, as herein, the newsgatherers choose to be participants in a story, beyond that as witnesses and reporters, then this protection may be eradicated. (See, In re American Broadcasting Cos. [People v Caputo],[7] NYLJ, June 8, 1995, at 37, col 3.)
Furthermore, in this age of participatory journalism where news, commentary, and sensationalism have become one, the role of a journalist in the public’s mind has become so entangled that it is often difficult to distinguish between news and entertainment. Although the newsgathering privilege is a fundamentally protected right, it should not be considered absolute or for that matter the unwritten "Eleventh Commandment.”
Under appropriate circumstances, "a reporter’s privilege * * * may yield to the defendant’s 6th Amendment rights.” (See, People v Troiano, 127 Misc 2d 738, 741; see also, People v Iannaccone, 112 Misc 2d 1057.) The Sixth Amendment guarantees the right of every criminal defendant, in both Federal and State courts, to be confronted with witnesses against him, including the right of cross-examination. (See, Douglas v Alabama, 380 US 415.) Indeed, the right to a fair opportunity to defend against the State’s accusations has been long recognized as essential to due process. (See, Chambers v Mississippi, 410 US 284.)
In arriving at the ultimate decision attendant to the within Huntley-Mapp hearing, it must first be determined when the defendant was placed in custody and the voluntariness of his statement. The People bear the burden of proof beyond a reasonable doubt to show that the defendant’s statement was voluntarily made and that the defendant knowingly and intelligently waived his constitutional rights. (See, People v Stoesser, 53 NY2d 648.)
In the case at bar, Mr. Sullivan has acknowledged that he entered the squad room during the course of the defendant’s interrogation and took notes of what he observed. Consequently, at least the parts of the interrogation which were observed by him are, per se, highly material and relevant to one of the primary issues at the pending suppression hearing. *540 Contrary to movant’s argument, the defendant is not on a "fishing expedition” for something that might prove helpful to his case. The statute imposes no additional duty upon the defendant of demonstrating helpfulness to the defense under the first prong of the test, merely that the information requested is highly material and relevant. This court finds that the defendant has made the requisite clear and specific showing to satisfy the first prong of the test.
Next, it must be determined whether or not the defendant has demonstrated, clearly and specifically, that the movant’s testimony is critical or necessary to his defense.
In determining whether the defendant has made a clear and specific showing that the information sought is critical or necessary to his defense, this court should not "substitute its judgment for a defendant’s on the question whether such evidence is 'necessary and critical’ to a defense.” (See, United States v Sanusi, 813 F Supp 149, 160.) Rather, the court should focus on the cogency of the defendant’s argument in light of all "possible defenses and acceptable defense tactics” (supra, at 159), and discount only "[v]ague and nonspecific claims of criticality and necessity”. (See, Matter of Subpoena Duces Tecum [Ayala], 162 Misc 2d 108, 114.)
In the case at bar, the presence of Mr. Sullivan in the interrogation room, whether with the approval of high police officials or not, is an abuse of the criminal justice system and may encroach on the defendant’s right to a fair trial.[8] By inviting a news reporter, who would ordinarily be excluded and whose presence is not necessary, into the interrogation room, the police have permitted a situation that is detrimental to the defendant.
Certainly, the Legislature did not intend for the newsgathering privilege protected by the Shield Law to foreclose a defendant’s constitutional rights.[9] Consequently, the personal observations and notes of Mr. Sullivan may provide the defen *541 dant with an opportunity through which he could clearly demonstrate that he was not afforded all the rights to which he is entitled.
Based on the facts supporting this claim and the consistency of the argument, I find that Mr. Sullivan’s testimony is critical to the maintenance of the defendant’s claim. Here, the defendant has presented a viable defense. Thus, he has made the requisite clear and specific showing to satisfy the second prong of the tripartite test.
With regard to the third prong of the tripartite test, I find that it has been satisfied by the defendant. The information sought is not available from an alternative source. In arguing that the defendant has failed to satisfy the third prong of the test, the movant contends that at least three alternative sources do, in fact, exist, those being: Detective Henson, Detective Howard, and the defendant himself. Since the detectives offered conflicting testimony concerning the presence of Timothy Sullivan at the interrogation, and inasmuch as they are in an adversarial position to the defendant, I cannot accept them as "the” reliable sources of information. Moreover, a defendant has an interest in the outcome of his case. Seemingly, he cannot rely on the court accepting his testimony as being the alternative source. Consequently, Mr. Sullivan’s testimony is the only alternative source, and so I find.
Accordingly, the motion to quash the subpoena is denied.

. The series was designed to follow, for a period of several months, cases that stem from police activity in the 101st Precinct.

. Civil Rights Law § 79-h.

. In 1975, the Legislature amended the statute by adding a provision which gave journalists immunity from disclosing sources of information in Grand Jury proceedings. (L 1975, ch 316, § 1.)
In 1981, the Legislature amended the statute to: (1) expand the scope of the terms "Professional Journalists” and "News”; (2) make it inadmissible as evidence, information acquired in violation of the statute and prohibited the fining or imprisoning of reporters who invoked the privilege; and (3) add provisions to ensure that reporters could not be held in contempt even if a particular governmental inquiry was involved. (L 1981, ch 468, §§ 1-3.)

. L 1990, ch 33, § 2 (eff Nov. 1, 1990).

. Professional Journalist for the purposes of this section is defined as "one who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping, or photographing of news intended for a newspaper * * * news agency, press association or wire service or other professional medium or agency which has as one of its particular functions the processing and researching of news intended for dissemination to the public; such person shall be someone performing said function either as a regular employee or as one otherwise * * * affiliated for gain or livelihood with such medium of communication.” (Civil Rights Law § 79-h [a] [6].)

. News for purposes of this section is defined as "written, oral, pictorial, photographic, or electronically recorded information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare”. (Civil Rights Law § 79-h [a] [8].)

. In that case, news reporters conducted a murder investigation, and videotaped the defendant’s confession.

. The Supreme Court has established that news media have no special right of access to all sources of information within government control (see, Pell v Procunier, 417 US 817; Saxbe v Washington Post Co., 417 US 843; Houchins v KQED, Inc., 438 US 1), and that no right ranks higher than the right of the accused to a fair trial. (See, Press-Enterprise Co. v Superior Ct. of Cal., 464 US 501.)

. As stated in the State Executive Department Memorandum to the most recent Shield Law amendments: "In applying this standard [qualified privilege] to criminal proceedings, the bill does not override the right to a fair trial guaranteed to defendants in criminal proceedings by the United States and New York State Constitution.” (1990 McKinney’s Session Laws of NY, at 2332 [emphasis added].)