OPINION OF THE COURT
Jeffrey M. Atlas, J.
The movants, all news broadcasters, seek to quash Grand Jury subpoenas served on them which demand production of videotapes taken by their employees of an incident occurring in Manhattan earlier this year. While aired footage of the incident has been turned over to the prosecutor, the movants have declined to turn over the unbroadcast or so-called “out-take” portions. It is these out-takes which are sought by the subpoenas.
The parties have supplied me with evidence pertaining to the matter, which includes the broadcast tapes as well as videotapes recorded by police personnel at the time of the incident in question. I have examined that evidence in considering the contentions of the parties and I have concluded that the motions to quash must be denied.
On June 30, 1998, protest demonstrations by many thousands of construction workers at two separate locations in midtown Manhattan ended in melees that resulted in injuries to civilians and police officers and the arrest of 33 persons for various crimes including obstruction of governmental administration and inciting to riot. As the violence erupted, 15 police officers were injured, some struck with bottles, debris or mace and some violently pushed by the crowd. The injured officers have, thus far, been unable to identify their attackers and, as a consequence, no protester has been charged with assault. Because of their injuries, these officers were unable to pick out their attackers during the tumult and were in no position to pick them out after the riot had been quelled and the crowd dispersed. In fact, the perpetrators could not be readily located at the time of the assaults because they apparently attacked the police from some point within the crowd of demonstrators and at some distance from the injured officers who were at the outer edge of the mob. Police supervisors on the scene at the time were also unable to identify the offenders because they were occupied trying to contain the surge of thousands of angry *1054 demonstrators. In addition, most of the injuries occurred at an early point in the disturbance and well before the arrival of hundreds of officers brought in as reinforcements.
As I have noted, portions of the protest were videotaped by the police department as well as by the movant broadcasting companies. The police tapes, made with small hand-held cameras, were shot from rooftops or on the street at the fringes of the crowd. These tapes do reveal some of the violence but, because of the locations of the cameras and the quality of the recordings, do not reveal the identities of any of the perpetrators of the assaults. The broadcast videotapes provided to me consist of scenes shot from a helicopter above the event as well as some footage shot by cameras posted at a few street-side locations close to, and at times within, the mob itself. These tapes, each only seconds in length, also show violent acts directed toward the police by demonstrators but fail to reveal the identities of the perpetrators of those acts. However, many of these published tapes reflect the fact that filming of the demonstration by the broadcast cameras did occur at the exact period of time during which the assaults took place and that those cameras were at ground-level locations very near the assaults and, at times, aimed into the area from which debris and other objects were thrown.
During the course of the Grand Jury investigation into this event, all police officers and supervisors claiming knowledge of the circumstances of these assaults were interviewed (with the exception of one who has not yet returned to duty because of injuries) and all of these officers reviewed the available tapes to see if they could recognize the location of the attacks on them and identify the persons responsible. While many officers could pinpoint the locations and even the time of the attacks, from the tapes at hand they were unable to identify any of the attackers. Consequently, the prosecutor’s office served the movant broadcasters with subpoenas directing the production of all unaired video and audiotapes of the incident before the Grand Jury investigating the matter. It is the District Attorney’s belief that examination by the injured officers of such unedited material collected throughout the event will yield evidence enabling prosecution of the assault cases. The broadcasters now move to quash those subpoenas pursuant to Civil Rights Law § 79-h, the so-called “Shield Law”.
Section 79-h of the Civil Rights Law reflects our State’s high regard for the values of free speech and a free press insofar as it protects journalists and newscasters from penalties for *1055 maintaining the confidentiality of their news-gathering activities. While the law provides “[a]bsolute protection for confidential news” (Civil Rights Law § 79-h [b]), where, as here, unpublished news has not been obtained in confidence, it is nevertheless protected by a qualified privilege exempting those journalists from contempt sanctions who refuse to disclose it “unless the party seeking such news has made a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party’s claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source.” (Civil Rights Law § 79-h [c].)[1] This enactment sought to resolve the uncertainties brought about by the New York Court of Appeals initial rejection of such a privilege in criminal Grand Jury proceedings (Matter of Knight-Ridder Broadcasting v Greenberg, 70 NY2d 151 [1987]), followed by the Court’s acceptance of the privilege in civil actions based upon its interpretation of article I, § 8 of the New York Constitution (O’Neill v Oakgrove Constr., 71 NY2d 521 [1988]). This legislation established the qualified privilege in both civil and criminal cases by requiring disclosure of nonconfidential material only as a last resort. The law thus struck a balance between the urgent requirements of litigants in both civil and criminal courts, and the countervailing need to prevent the “undue diversion of journalistic effort and disruption of press functions”, to maintain the “tradition in this State of providing the broadest possible protection to [secure] ‘the sensitive role of gathering and disseminating news of public events’ ” and to assure “particular vigilance by the courts of this State in safeguarding the free press against undue interference.” (Supra, at 528-529.) It is important to note, in the context of this case, the fact that the legislation sought to avoid “problematic incursions into the integrity of the editorial process when [journalists] are drawn into the criminal justice system merely because they have reported on a crime” by attempting to eliminate “the risk of (journalists] being used as investigative agents of the government or the defense” in criminal cases (Mem of State Exec Dept, 1990 McKinney’s Session Laws of NY, at 2331, 2332).
*1056 The movant broadcasters contend that the District Attorneys subpoenas should be quashed because the prosecution has failed to meet its burden of establishing the three conditions precedent set forth in Civil Rights Law § 79-h (c). They argue that allowing the subpoenas will have the effect of making these broadcasters investigative agents of the prosecution. The prosecution maintains that it has met its burden under the statute by demonstrating that the out-takes are important and necessary to the completion of its work in the Grand Jury. I believe that the prosecution has met its burden of establishing that the news sought in these out-takes is highly relevant and necessary to the maintenance of the assault claims and that it is not obtainable from any alternative source.
The very fact that such news is not obtainable from any other source makes the request of the prosecutor urgent and one of last resort (Civil Rights Law § 79-h [c] [iii]). It is patently clear that this is not a case in which the commission of the crime and the identity of the assailant can be fully established by the statement of the victim or of a person who has seen critical portions of the event. Here, assaults were apparently committed by perpetrators whose identities were concealed by the cover of the mob. The District Attorney has provided clear and specific reason to believe that the victimized police officers are the only witnesses available to testify to the specific acts of assault. The prosecution’s proof in this regard shows, without contradiction, that these witnesses were surprised and “blindsided” during the attacks and therefore unable to identify the perpetrators of these assaults. The movants attempt to challenge this proof, not by denying it, but rather by placing great emphasis on their claim that the District Attorney failed to seek information from possible alternative sources. They argue that the prosecution in this case should not be permitted to claim that there is no alternative source for the news it seeks, because the prosecution “failed to interview (or otherwise communicate with) the score of other police officers present at the scenes of the alleged assaults” and failed to attempt to identify numerous civilians in the vicinity of the attacks. In my estimation, the movants demand more of the prosecution than is contemplated by this statute and more in the way of investigation than it is reasonable to expect of any litigant. It is clear that most of the police officers at the scene arrived after the assaults were committed and immediately became involved in containing a near riot which, by its nature, was neither static nor conducive to reflective observation of crimes and the *1057 perpetrators of such crimes. In addition, these same officers were, for the most part, stationed at the edges of the crowd, some distance from the attackers. Under the circumstances, any expectation that these scores of additional officers might have observed the perpetrator of a particular assault is simply unrealistic. As for the movants’ notion that the police and prosecution should have made serious effort to find civilian witnesses, such an idea is equally impractical. I note in this regard the regrettable fact that civilians rarely volunteer their service as witnesses. Moreover, it is difficult to conceive of any method that the prosecution might have employed in identifying and locating cooperative civilians who may have observed this event at the very moment of the assaults and who were also in just the right position to see which demonstrator attacked and struck any given police officer. Thus, in this case, I cannot accept the movants’ argument that the District Attorney be required to exhaust every conceivable avenue of investigation before being given resort to the out-takes. While I do not argue with the general principle that broadcasters’ out-takes should not be disclosed except as a last resort, I cannot accept the proposition that the prosecution, in this context, should be denied disclosure of these tapes until they have looked for a needle in a haystack and, to the detriment of the public, expended its resources in a quest not reasonably likely to have positive results.
I have little difficulty in concluding that the out-takes sought by the prosecutor are highly material and relevant to the presentation of assault charges to the Grand Jury (Civil Rights Law § 79-h [c] [i]). While the movants argue that, even if the out-takes are relevant, they are not “highly material and relevant”, they offer no reason to support that contention. On the other hand, given the violent nature and duration of the disruption at the demonstration, much of which was filmed by the movants but little of which was broadcast, given the fact that the disclosed tapes clearly show the presence of press cameras amongst the crowd and directed toward the area of the attacks, and also given the fact that this Grand Jury is investigating those assaults, the inference is compelled that the outtakes do contain additional footage which is “highly relevant and material” to the Grand Jury’s work. (See, e.g., People v Korkala, 99 AD2d 161 [1st Dept 1984]; Matter of Subpoena [Sullivan], 167 Misc 2d 534 [Sup Ct, Queens County 1995]; United States v Cutler, 6 F3d 67 [2d Cir 1993]; cf., Matter of Grand Jury Subpoenas [Maguire], 161 Misc 2d 960 [Westches *1058 ter County Ct 1994]; Matter of Subpoena Duces Tecum [Ayala], 162 Misc 2d 108 [Sup Ct, Queens County 1994].)
The District Attorney’s office further contends that the videotapes it seeks are “critical [and] necessary” to the presentation of the police assault cases to the Grand Jury (Civil Rights Law § 79-h [c] [ii]). As the movants have pointed out, this provision of the Civil Rights Law is not satisfied absent clear and specific proof “that the claim for which the information is to be used Virtually rises or falls with the admission or exclusion of the proffered evidence’ ” (In re Application To Quash Subpoena to Natl. Broadcasting Co. v Graco Children Prods., 79 F3d 346, 351 [2d Cir 1996]). The test is not merely whether the material may be helpful or probative, but whether “ ‘the action may be presented without it’ ” (supra, at 351; see also, Flynn v NYP Holdings, 235 AD2d 907 [3d Dept 1997]; Matter of Grand Jury Subpoenas [Maguire], supra, at 965). The movants argue that, at best, these tapes might only prove helpful to the prosecutor but not critical to the presentation of their cases. However, as I have noted, the prosecution has specifically demonstrated that, without these tapes, they are totally unable to prosecute the assault cases. The prosecution has shown that, other than the broadcast camera crews, there are no witnesses available to them now who were uniquely in a position to see the assaults and the perpetrators of the assaults in such a manner as to reliably record the details and identities. Indeed, the evidence establishes that the members of the press recording this event are the only known observers who were in the midst of the fracas and who were not actually participants in the violence. It is that very fact that makes the evidence the broadcasters can give of critical importance to this Grand Jury.
Finally, the movants argue, the prosecutor has not shown that the tapes sought actually contain evidence highly relevant or necessary to the presentation of the assault claims. Movants contend that, while the tapes might contain the footage the District Attorney seeks, the prosecution has not shown that, in fact, they do. Here too, I believe that the movants hold the prosecution to a standard much higher than this statute can reasonably be read to require. It is the rare case in which a litigant, in advance of looking at items sought by subpoena, can actually establish that such items contain the very evidence the litigant needs. There are, of course, some reported cases in which litigants won discovery of the unpublished portions of press interviews by establishing from the published excerpts or *1059 from firsthand accounts of the unpublished portions that the remainder actually contained relevant and necessary matter (e.g., United States v Cutler, supra; Matter of Subpoena [Sullivan], supra). This does not mean, however, that the Civil Rights Law was meant to apply only in such situations. Obviously, there may be many instances in which the content of the unpublished news is not known to the party seeking it, but can be inferred from the content of the published portion or from witnesses’ accounts or from the circumstances surrounding its creation. Indeed, the latter is more likely to occur when the unpublished news is film or videotape of a public event rather than notes or out-takes of interviews attended by known witnesses. Obviously, all kinds of news, whether interviews or film footage of a public event, are subject to disclosure if there has been compliance with the provisions of the Civil Rights Law. There is no reason to believe that tapes of the kind sought here should be exempt from disclosure simply because their contents are proved circumstantially rather than directly. I am aware that a proposition proved by circumstantial evidence ordinarily cannot be said to have been established to an absolute certainty. However, I am of the view that fulfillment of a litigant’s burden under this statute should not be measured by such an absolute standard. I am mindful of the burdens such disclosure places upon the press and of the fact that the Legislature sought to avoid making the press an investigatory arm of the prosecution. I believe, however, that such stresses upon the freedom enjoyed by the press do not require that this statute be read to employ an unworkable and unrealistic burden of proof that might well result in the unqualified protection of nonconfidential news in certain classes of cases.[2] Judging this case by what I conceive of as the appropriate standard required by the law, it is evident that the circumstantial proof offered by the District Attorney clearly and specifically establishes the reasonable likelihood that the out-takes requested depict the occurrence of assaults on police officers at the demonstration and are therefore highly relevant and necessary to the prosecution of those crimes.
Although the prosecution in response to the motions to quash offered several alternative reasons in support of its need for access to the out-takes, for example, speculating that the tapes *1060 might contain exculpatory evidence with regard to the defendants already charged or provide corroboration of the testimony of police officers with respect to the arrests already made, I do not find that any of these reasons satisfy the criteria of the Civil Rights Law.
For the foregoing reasons, the motions to quash the Grand Jury subpoenas are denied.

. The prosecution argues at length that this motion should be denied because the value to the prosecution of the nonbroadcast videotapes outweighs the qualified privilege afforded to the media against disclosure. In this respect the District Attorney relies upon cases decided before the amendment to the Civil Rights Law and decisions of the Federal court in cases in which our statute did not apply. Clearly, the approach embodied in our statute is not shared by those Federal courts (see, Branzburg v Hayes, 408 US 665 [1972]; Gonzales v National Broadcasting Co., 155 F3d 618 [2d Cir 1998]).

. While I do not agree with the differing view, for the sake of perspective it is important to note again the decisions which hold that the press should enjoy no privilege at all with respect to nonconfidential material sought in criminal cases {supra, at 1055, n 1).