269 N.J. Super. 493 (1993)
635 A.2d 1019
IN THE MATTER OF THE PETITION OF MARGENA BURNETT FOR AN ORDER FOR ISSUE OF SUBPOENAS IN THE STATE OF NEW JERSEY UNDER ORDER AND COMMISSION ISSUED IN THE ACTION ENTITLED "STATE OF FLORIDA DEPARTMENT OF INSURANCE, AS RECEIVER OF GUARANTEE SECURITY LIFE INSURANCE COMPANY, PLAINTIFF, V. MERRILL LYNCH, PIERCE, FENNER & SMITH, ET AL., DEFENDANTS," PENDING IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT OF THE STATE OF FLORIDA IN AND FOR DUVAL COUNTY, CASE NO. 91-17911-CA, DIVISION C.
Superior Court of New Jersey, Law Division Union County.
August 27, 1993.
*494 Edward M. Suarez, Jr. for respondent A.M. Best Company, (Bumgardner, Hardin & Ellis attorneys; George R. Hardin of counsel; Mr. Suarez and Jeffrey A. Oshin on the briefs).
Charles B. Lembcke (admitted pro hac vice) for petitioner Margena Burnett (Datz, Jacobson, Lembcke & Garfinkel attorneys; Anthony J. LaRusso, Lindabury McCormick & Estabrook of counsel; Messrs. Lembcke and LaRusso on the briefs).
MENZA, J.S.C.
The respondent, A.M. Best Company, (Best) moves to quash a subpoena duces tecum which seeks production of certain insurance documents, and a subpoena ad testificandum, which seeks testimony relative to those documents. Both subpoenas were served upon Best by petitioner, Margena Burnett (Burnett).
Burnett is the wife of a former member of the board and director of the Guarantee Security Life Insurance Co. (GSLIC), which the State of Florida has placed in receivership. She has also occupied various positions in GSLIC affiliates and has served as the assistant to the chairman of Transmark USA, Inc., GSLIC's parent corporation.[1] The Florida Department of Insurance, as receiver of GSLIC, has brought suit against Margena Burnett alleging that she and others, in order to conceal GSLIC's insolvency, misrepresented GSLIC's financial condition to the Securities and Exchange Commission, the public, the company's policy holders, the insurance brokerage community and various insurance *495 rating services. The complaint against Burnett and the other persons includes causes of action for fraud, conspiracy to defraud, civil theft, breaches of fiduciary duties, breach of contract and negligence. Burnett contends she did not misrepresent the financial well-being of GSLIC and she alleges that the materials which she seeks from Best will support her contentions.
Best produces several insurance trade publications, including a weekly newsletter entitled "Best's Insurance Management Reports," a monthly magazine entitled "Best's Review" and an annual insurance rating report entitled, "Best's Insurance Reports, Health Life." Each year, Best gathers information from various insurance companies which it uses to rate the financial condition of the companies. These ratings are published in Best's annual report. From 1983 through 1991, GSLIC and its affiliates WPLIC and ALIC provided Best with information which Best used to rate these companies in its annual report.
Burnett now seeks the production of these documents, which she contends are relevant to the Florida litigation. Specifically, she contends that these documents will demonstrate that she did not misrepresent to the public the financial condition of GSLIC or its affiliates.
On April 8, 1993, this court entered an ex parte order pursuant to R. 4:11-4, on a petition by Burnett, authorizing the issuance of a subpoena duces tecum to Best requiring it to produce certain insurance documents received from GSLIC, WPLIC and ALIC. The order also authorized the issuance of a subpoena ad testificandum requiring certain officers of Best to testify regarding those documents.
Best now moves for an order quashing the subpoena, contending that it is entitled to a privilege from divulging the requested information under the First Amendment and the New Jersey Shield Law, N.J.S.A. 2A:84A-21.
Burnett opposes Best's motion, contending that the information acquired by Best was gathered for the sole purpose of it being *496 used in Best's annual publication, which she contends is not a news medium protected by either the First Amendment or the New Jersey statute. Specifically, she contends that the annual report does not fit the definition of news medium because it is disseminated only to Best subscribers and not to the general public and because the financial information contained in the report is not "news" within the meaning of the statute.
The question presented then is whether Best's annual report qualifies as a "news medium" so as to afford Best protection from divulging the information sought by Burnett under the First Amendment and the New Jersey Shield Law.
This is a novel question which has not been decided by the courts in this state. There are, however, cases from other jurisdictions which have addressed the scope of the privilege afforded by the First Amendment and by similar state statutes which are helpful in the determination of this case. Most of them suggest that a broad interpretation should be given to the privilege.
In Lovell v. City of Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938), the United States Supreme Court made it clear that the First Amendment privilege should encompass all kinds of information disseminated through all kinds of publications: "The liberty of the press is not confined to newspapers and periodicals.... The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."
In Branzburg v. Hayes, 408 U.S. 665, 705, 92 S.Ct. 2646, 2668, 33 L.Ed.2d 626 (1972), the Court reiterated that proposition, stating: "The informative function asserted by representatives of the organized press ... is also performed by lecturers, political pollsters, novelists, academic researchers and dramatists." It includes: "The lonely pamphleteer who uses carbon paper or a mimeograph just as much as ... the large metropolitan publisher who utilizes the latest photocomposition methods."
*497 In the case of In the Matter of Photo Marketing Ass'n Inter., 120 Mich. App. 527, 327 N.W.2d 515 (1982), the Michigan Court of Appeals applied this principle in holding that the publication of an association of photodealers and photofinishers, which gathered data concerning the operation and activities of its members, was entitled to the First Amendment privilege. The court stated:
In the instant case, the respondent does not compile the requested information for the purpose of creating a news story of interest to the "general public"; rather, its publications which summarize confidential data are intended for the narrower audience of its members and others in the trade. However, we find that the mere fact that a publication is technical in nature does not preclude the application of the First Amendment privilege against disclosure of confidential information. [Id. 327 N.W.2d at 517.]
And in Apicella v. McNeil Laboratories, Inc., 66 F.R.D. 78 (E.D.N.Y. 1975), the court concluded that a publisher of a medical bimonthly newsletter which contained articles on deaths relating to various drugs was to be afforded the First Amendment privilege, citing as authority Lovell and Branzburg.
The case of In re Scott Paper Co. Securities Litigation, 145 F.R.D. 366 (E.D.Pa. 1992), involved facts very similar to those presented in this case. In Scott, the plaintiffs brought an action against Scott Paper Company for securities fraud alleging that Scott made false and misleading representations concerning its operation, financial condition and future business prospects. The plaintiffs sought discovery from a non-party, Standard & Poor's Corporation (S & P) which published several periodicals containing financial information and ratings on the credit worthiness of publishing companies and their securities. The court held that S & P was entitled to assert a First Amendment qualified privilege because it was considered a news publication. In reaching its conclusion, the Scott court found the Supreme Court decisions in Lovell and in Lowe v. S.E.C., 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), to be instructive. In Lowe, the Supreme Court considered, but declined to determine, whether investment newsletters fall within the definition of the press for First Amendment purposes. The Scott court considered the tone of the Court in Lowe and determined that the Supreme Court would afford a *498 privilege to the publications at issue therein. The Scott court concluded: "[T]he Supreme Court would be likely to hold, if squarely faced with the issue, that the investment newsletters involved there would also be protected by the free press clause of the First Amendment." Scott, supra, 145 F.R.D. at 370.
It then held that S & P's publication was entitled to the First Amendment privilege because: "As a threshold matter, we see no reason why disseminators of corporate financial information should not have as strong a claim to First Amendment protection as do disseminators of other kinds of information. The value to society of financial reporting and analysis is beyond question." Id. at 369.
Similarly, in Citicorp v. Interbank Card Association, 4 Med. L.Rptr. 1430 (S.D.N.Y. 1978), the court held that a trade publication was news and entitled to a newsperson's privilege.
There are other courts, however, which have given the newsperson's privilege a more restrictive interpretation. In Deltec, Inc. v. Dun & Bradstreet, Inc., 187 F. Supp. 788 (N.D.Ohio 1960), a federal district court held that the defendant, who was engaged in publishing a bimonthly newsletter report on the financial status of companies and individuals, was not protected by the Ohio newsperson's statute from disclosure of its sources. The Ohio statute, which is somewhat similar to the New Jersey statute, provides:
No person engaged in the work of, or connected with, or employed by any newspaper or any press association for the purposes of gathering, procuring, compiling, editing, disseminating, or publishing news shall be required to disclose the source of any information procured or obtained by such persons in the course of his employment, in any legal proceeding, or trial. .. .
[Ohio Rev.Code § 2739.12 (Anderson).]
The court held that the publication did not fall with the statutory definition.
[I]t is difficult for us to see how the legislature meant to include such a publication as defendant's within the same protection, for it would have been a simple thing to do if it so desired. "Periodical" is specifically included in the sections before and after Section 2739.12, but is conspicuously absent in Section 2739.12. We cannot, under these circumstances, stretch the meaning of "newspaper or any press association" to include defendant, and the very fact that the legislature chose these *499 nouns indicates to us that it realized the ultimate and necessary effect of its language.
[Deltec, supra, 187 F. Supp. at 790.]
And in Matera v. Superior Court, 170 Ariz. 446, 825 P.2d 971 (Ct.App. 1992) the Arizona Court of Appeals held that Arizona's shield law did not apply to an author who was involved in writing a book on an undercover figure involved in a sting operation. The court stated that the plain language of the statute made it clear that it only applied to "a person engaged in newspaper, radio, television or reportorial work or connected with or employed by a newspaper, radio, or television." The court refused to expand the statutory privilege to include anyone engaged in and publishing information of topical and widespread interest. Id., 825 P.2d at 975.
Similarly, in the case of H.C. Wainwright & Co. v. Wall St. Transcript Corp., 418 F. Supp. 620 (S.D.N.Y. 1976), a federal district court concluded that a business news publication which published a weekly abstract of company financial reports violated federal copyright law when it published an abstract of the plaintiff's financial report, which the plaintiff had prepared for use in its brokerage business. The defendant argued that its publication was entitled to First Amendment protection, asserting that it was a newspaper because it was disseminating news by publishing abstracts of business and industrial reports. Id. at 624. The court disagreed, responding that:
The Transcript's ingenious designation of the reports as news is faulty. While the fact of Wainwright's issuing a report on a particular company or industry, and perhaps whether it was favorable or unfavorable, bullish or bearish, may be news, the precise contents of the report are not news  at least if the term is meant to indicate that the material, as is the case of true "news," is in the public domain. The original analytical contents, the style, impressions, estimates, assessments and appraisals of the reports are protected, as is the particular expression of the facts. The public has a right to know the facts, but does not have a right to know them in the particular form in which an author assembles and expresses them. [Ibid.]
The cases in which the courts have declined to extend the newsperson's privilege are distinguishable from this case. In Deltec, the court concluded that the omission of the word "periodical" *500 from the Ohio statute demonstrated the legislative intent to exclude the defendant's newsletter from the statutory privilege. In Matera, the Arizona shield law protected only persons engaged in "newspaper, radio, television, or reportorial work" and the court concluded therefore that the defendant's book did not fall within the limited scope of the statute. Finally, in Wainwright, the court denied the defendant's claim to a First Amendment privilege, not because the report could not be considered news, but because the contents of the report as they were published violated the plaintiff's copyright.
The New Jersey statute, which grants an absolute privilege, broadly defines the term "news media":
"News media" means newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public.
[N.J.S.A. 2A:84A-21a(a).]
There is no requirement in the statute that the news medium be published at particular intervals. Thus, Best's annual report falls within this definition of a news medium if the information it disseminates, namely insurance information, can be characterized as "news."
Webster's New World Dictionary, Second College Edition, defines "news" as:
1. New information about anything; information previously unknown. 2a) reports, collectively, of recent happenings, esp. those broadcast over radio or tv, presented in a newspaper, etc. b) any person or thing though to merit special attention in such reports.
The definition of "news" in the New Jersey statute is much broader than the dictionary definition. The statutory definition states:
"News" means any written, oral, or pictorial information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of any person engaged in, engaged on, connected with or employed by a news media and so procured or obtained while such required relationship is in effect.
[N.J.S.A. 2A:84A-21a(b).]
This definition encompasses not only information which reports on recent news events but any and all information which is *501 gathered and disseminated to the public. Clearly, the insurance information which Best gathers and disseminates falls within the plain language of the statutory definition of "news."
In any event, it is clear that the statute must be given a broad interpretation. The "newspaperman's" privilege statute, which was adopted in 1933, provides a privilege which was not permitted to the news media under the common law. It is a statute which is therefore in derogation of the common law and one which would normally be narrowly construed. See Brogan v. The Passaic Daily News, 22 N.J. 139, 150, 123 A.2d 473 (1956). Yet it appears from the First Amendment cases and the New Jersey cases which have considered the scope of the privilege that the courts generally afford a broad interpretation to the newsperson's privilege. For example, in the case of In re Avila, 206 N.J. Super. 61, 501 A.2d 1018 (App.Div. 1985), the court, in response to an argument that a twenty page tabloid printed in Spanish disseminated free to the public did not fit the New Jersey statute's definition of a newspaper, which required a paid circulation, concluded that it was in fact a news medium within the meaning of the statute. The court made it clear that the statute was to be given a broad and liberal interpretation:
... [W]e must be sensitive to the legislative momentum that has steadily expanded the scope of the statutory newsperson's privilege since its first enactment ... Our Supreme Court has declared that the scope of its present protection is "the greatest extent permitted by the Constitution of the United States and that of the State of New Jersey.
[Id. at 63, 501 A.2d 1018 (quoting In re Myron Farber, 78 N.J. 259, 270, 394 A.2d 330 (1978), cert denied 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978)).]
Undoubtedly, the purpose of the "newspaperman's" privilege was to protect those actually engaged in the gathering and disseminating of news of current events. It was therefore initially intended to protect reporters, that is, persons who gather current information for newspapers and disseminate it for a fee to the public. But it is also obvious that the courts have recognized that in this day and age what is considered to be "news media" or what constitutes "news" is not to be given the narrow interpretation *502 suggested by its origin. It is a recognition that we live in a society in which people are bombarded with all types of information, from publications which actually do report current events to those esoteric publications which describe the mating rights of penguins in the Antarctic at springtime. And it is the recognition that this society demands the open and full flow of information and ideas whatever they may be and from wherever they may come. It is clear therefore that the plain language of the statute and the expansive interpretation to be given to it, dictate that Best's annual report is a "news medium," which disseminates "news" and as such is entitled to the newsperson's privilege.
Motion to quash is granted.
NOTES
[1] GSLIC, Western Pacific Life Insurance Co. (WPLIC) and Adirondack Life Insurance Co. (ALIC) are wholly owned subsidiaries of Transmark, USA, Inc.