958 A.2d 85 (2008)
403 N.J. Super. 281
Donald J. TRUMP, Plaintiff-Respondent,
v.
Timothy L. O'BRIEN, Time Warner Book Group, Inc., and Warner Books, Inc., Defendants-Appellants.
Docket No. A-3905-06T2
Superior Court of New Jersey, Appellate Division.
Argued October 24, 2007.
Decided October 24, 2008.
*87 Mark S. Melodia (Reed Smith, LLP), Princeton and Mary Jo White (Debevoise *88 & Plimpton, LLP) of the New York bar, admitted pro hac vice, New York City, argued the cause for appellants (Reed Smith, LLP and Ms. White, Andrew J. Ceresney and Andrew M. Levine (Debevoise & Plimpton, LLP) of the New York bar, admitted pro hac vice, attorneys, New York City; Mr. Melodia, James F. Dial, Kellie A. Lavery, Princeton, Ms. White, Mr. Ceresney, and Mr. Levine, on the brief).
William M. Tambussi (Brown & Connery, LLP), Westmont and Mark P. Ressler (Kasowitz, Benson, Torres & Friedman, LLP) of the New York bar, admitted pro hac vice, New York City, argued the cause for respondent (Brown & Connery, LLP and Mr. Ressler and Marc E. Kasowitz (Kasowitz, Benson, Torres & Friedman, LLP) of the New York bar, admitted pro hac vice, attorneys, New York City; Mr. Tambussi, William F. Cook, Westmont, Mr. Ressler, and Mr. Kasowitz, on the brief).
Joel Kurtzberg (Cahill Gordon & Reindel, LLP) of the New York bar, admitted pro hac vice, New York City, argued the cause for amicus curiae Media Amici (Mr. Kurtzberg and Floyd Abrams (Cahill Gordon & Reindel, LLP) of the New York bar, admitted pro hac vice, on the brief).
Before Judges AXELRAD, PAYNE and SAPP-PETERSON.
The opinion of the court was delivered by
PAYNE, J.A.D.
In January 2006, Donald Trump filed suit in the Superior Court of New Jersey, Camden County, against Timothy O'Brien and his publisher,[1] claiming that O'Brien defamed him by reporting, in his 2005 biographical book, TrumpNation, that "[t]hree people with direct knowledge of Donald's finances, people who had worked closely with him for years, told me that they thought his net worth was somewhere between $150 million and $250 million," and observing "[b]y anyone's standards this still qualified Donald as comfortably wealthy, but none of these people thought he was remotely close to being a billionaire." In his suit, Trump claimed multi-billionaire status and argued that O'Brien's low estimates of his wealth injured his credit and otherwise harmed his business interests.
After issue was joined, Trump served discovery upon O'Brien that sought, among other things, the identity of the sources of O'Brien's information regarding Trump's net worth and his notes of interviews with those sources. When O'Brien declined to provide this information and certain other discovery, citing the newsperson's privilege, Trump moved to compel its production.[2] In opposition to the motion, O'Brien claimed with respect to the three sources that their identities were confidential, and that they feared retribution by Trump upon disclosure. The motion judge nonetheless granted Trump's *89 motion in its entirety. His order forms the basis for this appeal, which we consider by leave granted. In addition to the arguments of the parties, upon appeal we also have the benefit of amicus briefing, filed on behalf of a multitude of entities[3] with interest in the issues raised herein.

I.
O'Brien is a journalist who lives in New Jersey, but has worked throughout his career in New York for various publications including the Wall Street Journal and Talk magazine. At the time he wrote TrumpNation, O'Brien was employed as a staff writer for the New York Times, where according to the book's jacket, "he has written about leading business personalities, computer scams, Russia, the art world, Wall Street, terrorism, money and politics, and Donald Trump." O'Brien also covered the Trump businesses in 1990 as a research assistant to Wayne Barrett, the author of a Trump biography, and he is the author of a 1998 book, entitled Bad Bet: The Inside Story of the Glamour, Glitz, and Danger of America's Gaming Industry, that reported on Trump's casino dealings. O'Brien's research for Bad Bet "subsequently informed" newspaper articles that he wrote for the Times. In 2004, defendant participated in writing a series of articles about Trump, appearing in the Times in September of that year, that focused on Trump's efforts to recapitalize his casinos and on related issues such as his net worth. At that time he reported, in language very similar to that found in TrumpNation:
The largest portion of Mr. Trump's fortune, according to three people who had had direct knowledge of his holdings, apparently comes from his lucrative inheritance. These people estimated that Mr. Trump's wealth, presuming that it is not encumbered by heavy debt, may amount to about $200 million to $300 million. That is an enviably large sum of money by most people's standards but far short of the billionaire's club.
O'Brien has certified that he integrated research conducted in connection with the 2004 reportage with that undertaken in connection with his 2005 book. He has further stated that the sources of net worth information utilized in his reporting for the Times are the same as those utilized for TrumpNation, but that the revised wealth figures were the product of separate interviews, conducted while writing the book. In October 2005, at the time of TrumpNation's publication, the Times ran an excerpt from Chapter 6 of the book on the front page of the Sunday Business section that included the net worth information at issue in this case.
The jacket copy for TrumpNation describes the book in the following terms:
He has one of the highest-rated shows on television  yet he prefers to spend his nights at home, quietly watching television and munching hamburgers.
He has a line of stylish clothing and bottled water emblazoned with his name and unmistakable image  yet he once *90 needed a loan from his siblings to stay afloat.
His name is plastered on some of the most magnificent hotels and casinos in the world  yet his casino company, swamped in debt, was forced into bankruptcy.
This is the work of Donald Trump, full of glitz, glamour, and other people's money. Yet despite glaring cracks in the shimmering façade, the myth and the image have remained stubbornly impenetrable to a fascinated public  perhaps even to Trump himself. In this unique look inside the life of one of the world's most charismatic businessmen, entrepreneurs, and larger-than-life personalities, top New York Times investigative reporter Timothy L. O'Brien pulls back the velvet curtain surrounding the wizard of hype known simply as The Donald. Featuring interviews not only with Trump's closest friends and associates, but with Trump himself, TrumpNation delivers revelations of Trumpsize proportions. So step right up, ladies and gentlemen, to the shocking, hilarious, riveting, and completely true story of America's favorite billionaire bad boy, bad hair and all. From the massive egos of New York mayors he courted or defied, to the glamour queens he loved and lost, to the talking dolls, colossal casinos, and personal Oz he created out of smoke and mirrors, prepare to enter TrumpNation.

The book, written in a breezy, irreverent style, contains chapters that focus on Trump's childhood and family, his casino and real estate business dealings, his television ventures, the merchandizing of his name, and his financial difficulties in the early and mid 1990s. Each chapter ends with a facetious "TrumpQuiz." Collectively, maintains O'Brien, the quizzes provide the "secret keys to becoming a billionaire, just like Donald." For instance, at the conclusion of the first chapter (focusing on Trump's introduction of his new suit line at Macy's at a function that also featured his other consumer products and additionally focusing on a cross-country interview by O'Brien of Trump in his jet, during which Trump declared Clint Eastwood to be the greatest star ever and consumed quantities of Oreo cookies), the following TrumpQuiz appears:
To become a megabillionaire like Donald, you should:
1) Spend $500 and wear a navy, pin-striped Donald J. Trump Signature Collection suit.
2) Spend $550 and wear a gray, pin-striped Donald J. Trump Signature Collection suit, with a vest.
3) Memorize all the correct moves in Trump: The Game.
4) Watch Clint Eastwood movies.
5) Eat lots of Oreos.
6) Just pretend.
7) Read this book.
Readers are encouraged to send their answers to the quizzes to Trump who, O'Brien promises, will tabulate and rank the responses. The person with the most right answers "besides having the secret tools needed to become as fabulously wealthy as Donald, will also get one hundred free passes to the finale of Season Twelve of The Apprentice and a copy of How to Get Rich signed by [O'Brien's] mom."
Although light and somewhat facetious in tone, the book contains a significant amount of factual information, and to a reasonable extent it does "lift the curtain" on Trump's life as perceived by Trump, his friends, his associates, and of course, O'Brien. The book concludes with a listing of published references upon which O'Brien relied and an extensive series *91 of end notes that, among other things, give the dates of various interviews to which reference is made in the text and, on five occasions, refers to sources as confidential or anonymous. No note is provided in connection with O'Brien's three net worth sources.

II.
New Jersey's "newsperson's privilege" is set forth in identical language in N.J.R.E. 508 and N.J.S.A. 2A:84A-21. They provide:
[A] person engaged on, engaged in, connected with, or employed by news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated has a privilege to refuse to disclose, in any legal or quasi-legal proceeding or before any investigative body, including but not limited to, any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere
a. The source, author, means, agency or person from or through whom any information was procured, obtained, supplied, furnished, gathered, transmitted, compiled, edited, disseminated, or delivered; and
b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.
"News media" is defined by N.J.S.A. 2A:84A-21a(a) as "newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public." "News," in turn, is defined by paragraph (b) of that statute as "any written, oral or pictorial information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of any person engaged in, engaged on, connected with or employed by a news media and so procured or obtained while such required relationship is in effect."
In contrast to the law of New Jersey, New York's Shield Law, found at N.Y. Civ. Rights § 79-h, distinguishes between confidential and nonconfidential sources, providing absolute protection to the former and qualified protection to the latter. It states in section (b), applicable to professional journalists:
(b) Exemption of professional journalists and newscasters from contempt: Absolute protection for confidential news. [N]o professional journalist or newscaster presently or having previously been employed or otherwise associated with any newspaper, magazine, news agency, press association, wire service, radio or television transmissions station or network or other professional medium of communicating news or information to the public shall be adjudged in contempt ... for refusing or failing to disclose any news obtained or received in confidence or the identity of the source of any such news coming into such person's possession in the course of gathering or obtaining news for publication or to be published in a newspaper, magazine, or for broadcast by a radio or television transmission station or network or for public dissemination by any other professional medium or agency which has as one of its main functions the dissemination of news to the public, by which such person is professionally employed or otherwise associated in a news gathering capacity notwithstanding that the material or identity of a source of such material or related material gathered by a person described above performing a function described above is *92 or is not highly relevant to a particular inquiry of government and notwithstanding that the information was not solicited by the journalist or newscaster prior to disclosure to such person.
[Emphasis supplied.]
Section (c) of the statute provides, in language that is like in scope to that utilized in section (b), qualified protection for nonconfidential news obtained by a professional journalist, permitting disclosure only if "the party seeking such news has made a clear and specific showing that the news: (1) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source."
"Professional journalist" is defined in § 79-h(a)(6) as:
one who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for newspaper, magazine, news agency, press association or wire service or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public; such person shall be someone performing said function either as a regular employee or as one otherwise professionally affiliated for gain or livelihood with such medium of communication.
[Emphasis supplied.]
"News" is defined in § 70-h(a)(8) as "written, oral, pictorial photographic, or electronically recorded information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare."
Trump is a resident of New York and many of his business interests are located there. O'Brien's career is centered in New York, and TrumpNation was published in New York, although it was sold throughout the United States and elsewhere. On the other hand, Trump sued O'Brien in the Superior Court of New Jersey, he maintains significant casino interests in Atlantic City, and O'Brien resides in this State. Recognition of the fact that the case has a significant relationship to more than one state led the motion judge to address choice of law concerns. In doing so, he acknowledged that, if New Jersey law applied, O'Brien would win; "there's no doubt about it."[4] However, the judge found New York law to be applicable and, construing New York's Shield Law narrowly, he determined that it did not protect the materials at issue, because O'Brien's book constituted entertainment, not news, despite the judge's acknowledgment that it contained many items of news and concerned matters of public interest. Further, the judge held that, even if he had determined otherwise with respect to the applicability of the Shield Law's absolute privilege provisions, because O'Brien did not designate his three sources as confidential in his endnotes, the absolute protection provided for confidential materials by the Shield Law was unavailable. The judge likewise rejected, without significant examination or analysis, the applicability to the nonconfidential materials of both qualified protections provided by the Shield Law and analogous constitutional protections. As a final matter, the judge found that New York law did not protect *93 from discovery materials that related to the editorial process. We stayed the judge's order requiring the production of all withheld materials, pending this appeal.

III.
We cannot agree with many of the aspects of the motion judge's decision. We focus first on the judge's interpretation of New York law. At the hearing in this matter and on appeal, Trump has argued that New York's Shield Law is inapplicable to books, since books are not enumerated as a category of protected material in sections (b) or (c) of the Law or in its definition of "professional journalist," and no reported New York case[5] has extended the protections of the law to this category of materials. In contrast, defendants and amici have argued, we think persuasively, that legislative amendments to the Shield Law in 1981 were designed to address the court's conclusion, in People v. LeGrand, 67 A.D.2d 446, 415 N.Y.S.2d 252 (1979), that a much-published book and magazine author working on a non-fiction book about a prominent crime family for publication by a Harper & Row subsidiary, was not entitled to protect his interview materials from subpoena under the Shield Law because he, as a book author, did not meet the then-existing definition of professional journalist. Id. at 255. At the time, "professional journalist" was defined as "one who, for gain or livelihood, is engaged in gathering, preparing or editing of news for a newspaper, magazine, news agency, press association or wire service"  in the LeGrand court's view, "newscasters." Ibid. The 1981 amendment added to the definition of professional journalist, after the words "wire service," and to substantive sections (b) and (c) of the Shield Law, the phrase (which we have previously highlighted) "or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public."
We regard an author who obtains news in confidence for dissemination to the public through the medium of a published book as fitting within this definitional phrase. Our interpretation is consistent with a statement given by a sponsor of the 1981 amendments, Assemblyman Steven Sanders, who observed: "This bill will correct loopholes and fill gaps in the existing statute by protecting all professional journalists and newscasters from being forced to reveal their sources or notes or other information in their possession gathered or obtained while professionally engaged in the preparation of a news story intended for publication, broadcasting, or for other suitable professional dissemination to the public." Memorandum of Assemblyman Steven Sanders, New York State Legislative Annual-1981 at 257. Sanders stated that the redefining of "news" and "professional journalist" would ensure that "all persons professionally engaged in a journalistic capacity so described" would be "shielded from being required to reveal their sources." Ibid. And he continued in language of particular significance to this case:
All those persons, whatever their job titles, performing a legitimate journalistic function will be protected. But the highly absurd present situation of a Mr. Smith who writes news stories for [the] New York Times being covered while that same Mr. Smith six months later *94 leaving the Times and beginning work on an investigative book of non-fiction intended for sale to ... Harper & Row is not covered, is corrected in this bill. Thus the new bill will protect the journalistic process wherever that process is being professionally undertaken.[6]
[Ibid.]
That the amendment does not specifically refer to books  a crucial failing in Trump's view  but instead utilizes broader but arguably more opaque language, can be explained by the sponsors' determination to close all loopholes, not merely those applicable to book authors.
We note in this regard that our failure to recognize authors of non-fiction books as covered by New York's Shield Law would result in an even more anomalous result than that occurring in LeGrand and referenced by Assemblyman Sanders, since it would result in protection of O'Brien's sources if suit arose from his 2004 article in the Times or from the 2005 extract of his book in that newspaper, but would not protect the same sources in the present context. We decline to torture the language of the Shield Law so as to achieve so indefensible a result.

IV.
Despite his recognition that "some" of the content of TrumpNation constituted "news" and that the subject of Trump's net worth was "certainly" a matter of "public interest," the motion judge, observing that "the tone sets what the book is," found TrumpNation to have been marketed as and to constitute entertainment, and thus to be unprotected by New York's Shield Law. We disagree and, once again, substantially accept the arguments of defendants and amici that, as a non-fiction work focusing on matters of public interest, TrumpNation falls within the broad definition of "news" set forth in the Shield Law and the protections of sections (b) and (c) of that Law.
In In re Sullivan, 167 Misc.2d 534, 635 N.Y.S.2d 437 (Sup.Ct.1995), a New York trial judge observed, in the course of determining whether the notes of an investigative journalist who sat in on portions of a criminal defendant's confession at police headquarters were qualifiedly protected from discovery by that defendant for use in a hearing challenging the police's procedures in obtaining the confession:
[I]n this age of participatory journalism where news, commentary, and sensationalism have become one, the role of a journalist in the public's mind has become so entangled that it is often difficult to distinguish between news and entertainment although the newsgathering privilege is a fundamentally protected right, it should not be considered absolute or for that matter the unwritten "Eleventh Commandment."
[Id. at 440-41.]
At the motion hearing in the present case, the judge relied on this statement as support for his conclusion that O'Brien, as author of a book that was entertaining in tone, was not subject to the Shield Act's protections. We do not view the statement in Sullivan, written in the context of an analysis of the applicability of the Shield Law's qualified privilege provisions, as precedential to our analysis of the applicability of the Law's absolute privilege here. In the present context, we regard the Sullivan judge to have correctly perceived the close association of entertainment and news in popular media contexts. *95 But we find a danger, recognized in the allied areas of privacy law and defamation,[7] in simply weighing the entertainment value against the news value of a non-fiction publication and according Shield Law protection or not on our essentially subjective view of which is the weightier. As the Supreme Court recognized in a privacy context in Time Inc. v. Hill, 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456, 467 (1967), the line between the two is too elusive to form a basis upon which to gauge the extent of critical and absolute press protections. (Citing Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840, 847 (1948)). See also Jenkins v. Dell Publ'g Co., 251 F.2d 447, 451 (3d Cir.) ("Once the character of an item as news is established, it is neither feasible nor desirable for a court to make a distinction between news for information and news for entertainment in determining the extent to which publication is privileged."), cert. denied, 357 U.S. 921, 78 S.Ct. 1362, 2 L.Ed.2d 1365 (1958). And, as defendants emphasized to the judge at the motion hearing, the Shield Law sensibly requires only that "one" of the main functions be the dissemination of news (including matters of public interest) to the public.
Without doubt, details of the life of Trump, whether entertainingly reported or not,[8] constitute matters of public interest and thus "news" protected by the Shield Law. Unfortunately, the relevant cases deciding the parameters of news in a Shield Law context are unreported.[9] However, decisions construing the scope of New York's Privacy Law, N.Y. Civ. Rights §§ 50-51, which prohibits a person or company from using a person's name or picture for advertising purposes or trade, without first having obtained permission, but exempts from its purview matters that are "newsworthy" or matters "concerning the public interest" have extensively addressed what constitutes the public interest. In Paulsen v. Personality Posters, Inc., 59 Misc.2d 444, 299 N.Y.S.2d 501 (Sup.Ct.1968), a trial court stated:
The scope of the subject matter which may be considered of "public interest" or "newsworthy" has been defined in the most liberal and far-reaching terms. The privilege of enlightening the public is by no means limited to dissemination of news in the sense of current events but extends far beyond to include all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general.

*96 [Id. at 506.]
A similar expression of the broad scope of matters considered "newsworthy" can be found in the decision of the New York Court of Appeals in Messenger v. Gruner + Jahr Printing and Publ'g, 94 N.Y.2d 436, 706 N.Y.S.2d 52, 727 N.E.2d 549, 552 (N.Y.Ct.App.2000). There, the Court held that "[n]ewsworthiness includes not only descriptions of actual events" including details of a matrimonial action and a half-time show at a football game, "but also articles concerning political happenings, social trends or any subject of public interest." Ibid.
Although Trump argues that cases concerning the scope of New York's Privacy Laws' exception for matters that are newsworthy or in the public interest are irrelevant in the present Shield Law context, we disagree. Both privacy and defamation laws seek to protect a person's interest in controlling information written or spoken about him without his consent. These interests clash with the constitutional guarantees of a free press provided by the First Amendment that are the subject of exceptions to the Privacy Law for newsworthy and public interest matters and the extensive protections of the Shield Law applicable to news. It would be illogical to determine that a book was of public interest when privacy rights are asserted, but not of public interest when Shield Law protections were invoked.
Our review of TrumpNation satisfies us that, regardless of its tone, the book conveys newsworthy information of interest to the public. Under the definition of "news" found in the Shield Law, that is sufficient to trigger the absolute protection of confidential sources provided by that statute. We therefore reverse the motion judge's contrary conclusion as a mistaken interpretation of New York law.

V.
In a certification filed in opposition to Trump's motion to compel discovery, O'Brien stated:
6. In reporting about Trump's net worth for The Times (and later TrumpNation) I promised confidentiality to three individuals with direct knowledge of Trump's finances who  given what they believed to be the extent of Trump's debt and his true ownership interest in properties that bear his name  estimated Trump's net worth to be in the range of $200 million to $300 million. It is my understanding that these three individuals fear retribution from Trump if their identities are revealed.
Nonetheless, the motion judge concluded that, regardless of whether TrumpNation conveyed news, O'Brien could not invoke the absolute protections of the Shield Law because the sources that he declined to identify were not confidential. In doing so, the judge discounted the evidential value of O'Brien's certification, and he based his ruling on the fact that O'Brien did not indicate the confidentiality of these sources in his endnotes, or indeed, annotate in any respect that portion of his text that refers to these three individuals, whereas in five other instances, sources were specifically designated as anonymous or confidential.
In Andrews v. Andreoli, 92 Misc.2d 410, 400 N.Y.S.2d 442 (1977), a judge of the New York Supreme Court discussed at length the proofs required for a journalist to establish the confidentiality of his sources. He stated:
Clearly, the "cloak of confidentiality" essential to invocation of the privilege is established ... "upon an understanding, either express or implied, that the information or its sources will not be disclosed."

*97 To invoke the privilege the journalist carries the burden of proffering at least preponderant evidence of the mutuality of the understanding, or agreement, of confidentiality. He may do so by direct or indirect evidence, by presenting proof of an express, i.e., a verbalized, understanding or agreement, or by offering preponderant proof of circumstances from which a mutual agreement of confidentiality may reasonably be implied.
Needless to say, the understanding or agreement of confidentiality is express when the terms thereof have been mutually stated by the principals, i.e., by the informant (i.e., source) and by the journalist. And it makes no difference who requests or offers the requisite confidentiality so long as both principals agree thereon. On the other hand, an understanding or agreement of confidentiality may be implied in fact when, from the acts and conduct of the newsman and his informant (i.e., source), or from custom and usage, or from the circumstances surrounding the imparting or gathering of the news, it is reasonable to conclude that the principals mutually intended that the identity of the source and the substance of the news or information would be maintained confidential.
[Id. at 447-48 (citation omitted).]
See also Solargen Elec. Motor Car Corp. v. Am. Motors Corp., 506 F.Supp. 546, 551 (N.D.N.Y.1981).
We view the totality of the evidence offered by O'Brien as sufficient to demonstrate the confidentiality of his sources. First of all, we note the fact that O'Brien chose not to identify them in either his Times article or in TrumpNation, thereby diminishing to an extent the weight that O'Brien's allegedly low-ball estimates of Trump's income would have had were his sources identified, thus permitting a detailed evaluation of the extent and accuracy of their knowledge.[10] Second, O'Brien has attested to the fact that the sources sought confidentiality because of fear of retribution and he agreed to provide it. And third, common sense supports the sources' desire for confidentiality since, if identified, it appears inevitable that they would be named as defendants in Trump's defamation suit and would likely suffer additional personal and economic consequences. Contrary to the motion judge's view, we find no precedent to support a claim that an express designation of a source as confidential is required to establish that status, and we find the omission of that designation in O'Brien's end notes to form an insufficient evidential foundation for the judge's ruling in this regard when weighed against the evidence in favor of confidentiality that we have discussed. Certainly, it would be unreasonable to conclude that the confidentiality sought and afforded in connection with O'Brien's Times article was somehow waived by the publication of TrumpNation as the result of the omission of an endnote confirming the sources' status.

VI.
New York's Shield Law, as well as the United States Constitution and the New York Constitution, art. I, § 8, each provides a qualified privilege to nonconfidential news that can be overcome only by a "clear and specific" showing that the news "(i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof *98 of an issue material thereto; and (iii) is not obtainable from any alternative source." § 79-h(c). On appeal, defendants contend that the judge's wholesale ruling that all the materials sought by Trump were nonconfidential and that Trump had made the clear and specific showing of relevance, need, and unavailability required by section (c) was evidentially unsupported. We agree.
Our review of the hearing record in this matter suggests that the judge's focus when considering this issue was almost entirely on the disclosure of the three sources whose identity he had found to be nonconfidential  the apparent focus of Trump's case. For that reason, the judge did not meaningfully examine or discuss the relevance of any of the remaining discovery sought by Trump, his particularized need to obtain the discovery in order to maintain his claim, or the availability of other sources for the material.[11] Nor did Trump make any particularized showing, or really any showing at all, that would satisfy section (c)'s requirements. Indeed, at the time of the motion hearing, no depositions had taken place that would serve as a foundation that could be used by Trump to overcome New York's qualified statutory privilege. For those reasons, the judge's ruling cannot be sustained. See Brown & Williamson Tobacco Corp. v. Wigand, 228 A.D.2d 187, 643 N.Y.S.2d 92, 93 (1996); Subpoena Duces Tecum to ABC v. Crea, 189 Misc.2d 805, 735 N.Y.S.2d 919, 921-22 (Sup.Ct.2001).
In connection with his determination that section (c) did not protect the discovery sought by Trump in his motion, the judge additionally held as a matter of law that the New York Shield Law does not offer protection for information related to the editorial process. We again disagree, concluding that no such exception to the Shield Law exists, and in any case, equivalent constitutional protections operate to render such materials privileged. As the Solargen court observed, "[t]he editorial process ... has enjoyed a long-standing privilege." Solargen, supra, 506 F.Supp. at 549. In a newspaper context, the court stated:
A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials whether fair or unfair constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press, as they have evolved to this time.
[Ibid. (quoting Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 258, 94 S.Ct. 2831, 2839-40, 41 L.Ed.2d 730, 741 (1974)).]
See also People v. Iannaccone, 112 Misc.2d 1057, 447 N.Y.S.2d 996, 997 (Sup. Ct.1982) (acknowledging a reporter's interest in protecting confidential sources and "preventing intrusion into the editorial process.").
We are not persuaded by the opposing precedent offered by Trump: Scott v. Cooper, 227 A.D.2d 463, 642 N.Y.S.2d 935 (1996); In re Subpoena to Sullivan, Concerning People v. Hurley, 167 Misc.2d 534, 635 N.Y.S.2d 437 (Sup.Ct.1995); and Greenleigh Assocs., Inc. v. N.Y. Post Corp., 79 A.D.2d 588, 434 N.Y.S.2d 388 *99 (1980). In Sullivan and Scott, components of the editorial process were found to be discoverable only after a determination had been made that the party seeking the discovery had met the three-part test of section (c). Sullivan, supra, 635 N.Y.S.2d at 440-42; Scott, supra, 642 N.Y.S.2d at 936. The other case upon which Trump relies, Greenleigh, was decided in 1980, at the time when New York law provided protection only to confidential materials, and before the law was amended to provide qualified protection to materials that were non-confidential.
Because Trump did not meet his burden of demonstrating the three elements set forth in section (c) by clear and specific evidence, we reverse the order requiring production of documents and discovery by defendants in its entirety, determining on the basis of the present record that all materials are protected by New York's Shield Law.

VII.
As we noted at the outset, the motion judge acknowledged at the hearing on Trump's motion that, were New Jersey law to apply, all the discovery sought by Trump would be protected by New Jersey's newsperson's privilege. The judge was correct. As we have observed: "the Supreme Court has held that in the absence of a countervailing constitutional right, the privilege from disclosure provided by the Shield Law is `absolute.'"[12]Kinsella v. Welch, 362 N.J.Super. 143, 154, 827 A.2d 325 (App.Div.2003) (quoting Maressa v. N.J. Monthly, 89 N.J. 176, 187-89, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982)). Moreover, we have found that privilege, applicable to information gathered in the scope of professional newsgathering activities, whether or not disseminated, to be triggered regardless of whether the information was "derived from a confidential source." Kinsella, supra, 362 N.J.Super. at 152, 827 A.2d 325 (quoting Woodhaven Lumber & Mill Work, 123 N.J. 481, 490, 589 A.2d 135 (1991)). See also In re Venezia, 191 N.J. 259, 261-62, 922 A.2d 1263 (2007) ("New Jersey's Shield Law, N.J.S.A. 2A:84A-21 to 21.8, also known as the newsperson's privilege, provides the news media far-reaching protections that are equaled by few states in the nation.").
Further, it is unquestionable that, under New Jersey law, information developed by O'Brien for his Times article and for TrumpNation constitutes news, and that in collecting and utilizing that information, O'Brien acted as a member of the news media, as defined by the Shield Law. We examined the intersection of news and entertainment in our decision in Kinsella, a case alleging an invasion of privacy as the result of emergency room filming by NYT Television for use in a televised show, and there observed that "courts should be chary of deciding what is and what is not news." Id. at 154, 827 A.2d 325 (quoting Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 561, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588, 607-08 (1985) (quoting dissent below by Meskill, J., 723 F.2d 195, 215 (2d Cir.1983))). We then concluded that the videotapes, although shot in part for entertainment purposes, constituted news. Id. at 154-55, 827 A.2d 325.
In In re Burnett, 269 N.J.Super. 493, 635 A.2d 1019 (Law Div.1993) Judge Menza observed:

*100 [I] is also obvious that the courts have recognized that in this day and age what is considered to be "news media" or what constitutes "news" is not to be given the narrow interpretation suggested by its origin. It is a recognition that we live in a society in which people are bombarded with all types of information, from publications which actually do report current events to those esoteric publications which describe the mating [rites] of penguins in the Antarctic at springtime. And it is the recognition that this society demands the open and full flow of information and ideas whatever they may be and from wherever they may come.
[Id. at 501-02, 635 A.2d 1019.]
We regard the principles expressed in Kinsella and Burnett to be applicable here. Although little precedent exists on the issue,[13] we are satisfied that the definition of news media to include "newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed ... means of disseminating news to the general public," N.J.S.A. 2A:84A-21a(a) (emphasis supplied) is sufficiently broad in scope to encompass books. Indeed, the exception of that medium of communication from the protections of the New Jersey Shield Law would make no policy sense and would substantially undercut the Law's goals of protecting the free exchange of ideas[14] as expressed in Maressa, 89 N.J. at 184-88, 445 A.2d 376 and other cases such as In re Schuman, 114 N.J. 14, 20-25, 552 A.2d 602 (1989).
The expansive protections afforded to newspersons by New Jersey law are thus consonant with the protections afforded to the confidential materials of newspersons in New York, raising no conflict of laws that we must resolve. See Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621, 917 A.2d 767 (2007); Erny v. Estate of Merola, 171 N.J. 86, 100-01, 792 A.2d 1208 (2002); Fu v. Fu, 160 N.J. 108, 118, 733 A.2d 1133 (1999) (all applying governmental interest analysis to choice of law issues, commencing with a determination whether an actual conflict exists between the laws of the states at issue).
Noting that New Jersey's protections, overall, are greater than those of New York, defendants urge us to find that New Jersey has the greatest interest in protecting newsgathering activities, and thus that New Jersey law should be applied to prevent the disclosure of the nonconfidential materials that the motion judge deemed discoverable in this case. We recognize the existence of precedent supporting this result. See, e.g., Kinsella, supra, 362 N.J.Super. at 152-55, 827 A.2d 325 (applying New Jersey's Shield Law to protect New York entities); In re Grand Jury Subpoena of Vrazo, 176 N.J.Super. 455, 459-65, 423 A.2d 695 (Law Div.1980) (applying New Jersey Shield Law to Pennsylvania reporter employed by Philadelphia newspaper who was summoned before a New Jersey Grand Jury); Robert D. Sack, Sack on Defamation § 15.3.2 (3d ed. 2006) (observing, "Courts have refused to apply the law of the plaintiff's domicile where the plaintiff has sued in another state  the state where the defendant is domiciled...  and where another state, typically the forum, has a significant relationship to the parties or the issues."). However, in light of our determination that Trump *101 failed to sustain his burden of proof of entitlement to discovery of the nonconfidential materials, we decline to take the step that defendants urge, lacking knowledge of whether the issue will ripen and, if it does, an understanding of the issue's precise contours.
The order granting discovery in this matter is reversed, and the case is remanded for further proceedings.
NOTES
[1] Trump named as defendants Time Warner Book Group, Inc. and Warner Books, Inc. Defendants state in their brief on appeal that Warner Books Inc. is now known as Grand Central Publishing. It is a subsidiary of Hachette Book Group USA, Inc., which formerly was known as Time Warner Book Group, Inc.
[2] In all, defendants withheld 653 documents on the basis of the newsperson's privilege while producing over 40,000 pages of non-privileged documents. The withheld materials contain notes of interviews with confidential and nonconfidential sources, drafts of the book, and communications concerning news-gathering and editorial processes. With the exception of discovery regarding Trump's net worth, the relevance of the other discovery requests has not been substantively addressed by Trump in his initial motion or on appeal.
[3] Amici are: ABC, Inc., The American Booksellers Foundation for Free Expression, The Association of American Publishers, Inc., The Associated Press, The Authors Guild, Inc., Clear Channel Communications, Inc., Dow Jones & Company, Inc., HarperCollins Publishers, LLC, The Hearst Corporation, Magazine Publishers of America, The McGraw-Hill Companies, Inc., The New York Newspaper Publishers Association, Inc., The New York Times Company, North Jersey Media Group Inc., Penguin Group (USA), Inc., The Reporters Committee for Freedom of the Press, St. Martin's Press, LLC, Simon & Schuster, Inc., and the WIW Freedom to Write Fund.
[4] In light of the judge's unequivocal statements at the motion hearing, we attach no significance to the fact that the judge, drafting his own order, failed to include language echoing his determination of this issue, contained in a proposed order submitted by defendants.
[5] Defendants and amici point to two unreported federal decisions that interpret New York's Shield Law to include books and their authors. Stewart v. National Enquirer, 28 Media L. Rptr. (BNA) 1596 (S.D.N.Y.1999) and Torah Soft, Ltd. v. Drosnin, 2001 U.S. Dist. Lexis 18614 (S.D.N.Y.2001).
[6] Our view mirrors that of Magistrate Judge Francis in his unreported decision in Torah Soft Ltd., supra, 2001 U.S. Dist. Lexis 18614.
[7] See, e.g., Weiner v. Doubleday & Co., 74 N.Y.2d 586, 550 N.Y.S.2d 251, 549 N.E.2d 453, 457 (1989) (in a libel context rejecting argument that the text at issue was mere gossip, stating that "[t]his is precisely the sort of line-drawing that, as we have made clear, is best left to the judgment of journalists and editors, which we will not second-guess absent clear abuse."), cert. denied, 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990).
[8] We reject Trump's argument that In re Madden, 151 F.3d 125 (3d Cir.1998) provides precedent supporting the conclusion that there is no Shield Law protection for tongue-in-cheek recitations since, there, Madden admitted he was an "entertainer disseminating hype, not news." Id. at 130.
[9] See Stewart, supra, 28 Media L. Rptr. at 1597-98 (declaring as news a celebrity profile of Martha Stewart that formed the basis for the allegedly expert conclusion that she was mentally ill); People v. Ford, 2007 N.Y. Misc. Lexis 55 (N.Y.Crim.Ct.2007) (protecting from production in defense of criminal charges video footage of non-public persons at a nightclub filmed for an MTV show entitled "True Life: I'm a Staten Island Girl"); Bement v. N.Y.P. Holdings, Inc., 29 Media L. Rptr. 2493, 2001 WL 1674805 (N.Y.Sup.Ct.2001) (holding that the fact that a past Miss Universe had become a CIA agent was "news").
[10] As stated by the Court of Appeals in Beach v. Shanley, 62 N.Y.2d 241, 476 N.Y.S.2d 765, 465 N.E.2d 304 (1984), "it would be of great interest that an unaccredited revelation about foreign affairs came from the Secretary of State rather than a mail clerk." Id. at 308 n. 4.
[11] Compare NBC v. People, 238 A.D.2d 618, 657 N.Y.S.2d 970 (1997) (requiring an in camera inspection of videotapes to determine what portions were discoverable under the statute's criteria for disclosure of nonconfidential materials).
[12] The Court has, however, recognized that the privilege can be waived. In re Venezia, 191 N.J. 259, 262, 922 A.2d 1263 (2007). Moreover, it does not extend to a reporter who conceals his professional identity from his source or who witnesses or participates in any act involving physical violence or property damage. Id. at 271, 922 A.2d 1263.
[13] We note, however, that Burnett applies New Jersey's Shield Law to A.M. Best, a publisher in book form of insurance company ratings.
[14] We regard the motion judge's determination that shield laws operate solely to protect journalists to be unjustifiably narrow.